UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CLEMENTE HERNANDEZ-GARCIA,<br><br>Defendant. | Case No.: 19-CR-4373-GPC<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS FOR AN ALLEGED VIOLATION OF THE POSSE COMITATUS ACT.**<br><br>**[ECF No. 15.]** |
|---|---|

On January 3, 2020, Defendant Clemente Hernandez-Garcia filed a motion to suppress "all evidence the government has obtained as a result of his arrest on two bases: (1) for arresting Mr. Hernandez-Garcia without probable cause; and (2) for violation the Posse Comitatus Act ('PCA')." (ECF No. 15.) On January 10, 2020, the Government filed a response. (ECF No. 27.) On January 28, the Government filed a second response. (ECF No. 34.)

This Order addresses Defendant's argument as to the Posse Comitatus Act. Based on the Parties' filings, the Court **DENIES** Defendant's motion. The Court **FINDS** that there is no PCA violation here as the involvement of Department of Defense ("DoD") personnel was authorized by statute.

1

19-CR-4373-GPC

# I. Factual Background

On October 19, 2019, Border Patrol Agent ("BPA") Edwin Allen-Limon was out on patrol near the border town of Jacumba, California. (ECF No. 15-1, Ex. B, BPA Allen-Limon's Memorandum of Investigation.) "Department of Defense personnel were operating a scope truck with fully functional infrared night vision capabilities, from an elevated position" in the area. (*Id.*) The DoD employee informed BPA Allen-Limon via radio transmission that "an individual had jumped the United States/Mexico international boundary fence near an area that BPAs refer to as 'Mercado Rock.'" (*Id.*) This area is located approximately one third of a mile north of the international border and about 26 miles east of the Tecate, California Port of Entry.

Shortly after the radio transmission, a second BPA named "J. Garcia," who was operating a "Mobile Surveillance Capabilities truck," informed BPA Allen-Limon that he had just "observed the individual running northbound . . . across highway 80 and into a heavily overgrown area." (*Id.*) Inferring that the individual spotted by BPA J. Garcia was the same person observed jumping the international border fence by DoD personnel, (ECF No. 27 at 3–4), BPA Allen-Limon went to "the last known location of the individual" near highway 80 and "began to search the brush." (ECF No. 15-1, Ex. B.)

There, BPA Allen-Limon found Defendant allegedly "attempting to conceal himself amongst the thick brush." (*Id.*) The Parties dispute what occurred once BPA Allen-Limon engaged the Defendant, but agree Defendant was eventually removed from the area and placed under arrest. (*Id.*; ECF No. 15-1, Ex. A, Declaration of Defendant Clemente Hernandez-Garcia.)

# II. Analysis

### a. The DoD Personnel's Conduct Here is Authorized by the 2016 NDAA.

Defendant asks the Court to suppress any evidence obtained by DoD personnel on the basis that Defendant's arrest was the result of a violation of the Posse Comitatus Act,

18 U.S.C. § 1385. (ECF No. 15 at 6–14.) The Government asserts that the PCA does not apply here as Congress authorized the DoD's involvement in certain criminal prosecutions along the United States – Mexico international border under the National Defense Authorization Act for Fiscal Year 2016 (the "2016 NDAA"), Pub. L. No. 114-92, 129 Stat. 726 (2015). (ECF No. 27 at 4–6.) Defendant maintains, in contrast, that the 2016 NDAA is merely a lapsed appropriation act and thus has no bearing on this matter. (ECF No. 15 at 10–12 (citing *Tin Cup, LLC v. U.S. Army Corps of Engineers*, 904 F.3d 1068, 1072–73 (9th Cir. 2018)). In deciding between these arguments, the Court relies on its prior decision in *United States v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 601660 (S.D. Cal. Feb. 7, 2020), and finds that the 2016 NDAA is an authorization act which permits the DoD's involvement in the instant prosecution.

As a general matter, Congress traditionally effects its "power of the purse" through "two sequential steps: (1) enactment of an authorization measure that may create or continue an agency, program, or activity as well as authorize the subsequent enactment of appropriations; and (2) enactment of appropriations to provide funds for the authorized agency, program, or activity." BILL HENIFF JR., CONGRESSIONAL RESEARCH SERVICE, OVERVIEW OF THE AUTHORIZATION–APPROPRIATIONS PROCESS at 1 (November 26, 2012), available at https://fas.org/sgp/crs/misc/RS20371.pdf. These steps thus provide for "two separate types of measures—authorization bills and appropriation bills." JESSICA TOLLESTRUP, CONGRESSIONAL RESEARCH SERVICE, THE CONGRESSIONAL APPROPRIATIONS PROCESS: AN INTRODUCTION at 1 (February 23, 2012), available at https://www.everycrsreport.com/files/20120223_97684_29eebdcfa364aecc2b0f9fff1e3c41796740a5f8.pdf.

"Authorization bills establish, continue, or modify agencies or programs." *Id.*; *see, e.g.*, *Selective Serv. Sys. v. Minnesota Pub. Interest Research Grp.*, 468 U.S. 841, 844 (1984) (reversing a lower court ruling that found unconstitutional a provision of the

3

Department of Defense Authorization Act of 1983 limiting educational funding for eligible persons who failed to register with the selective service). "An authorization act may also explicitly authorize subsequent appropriations for specific agencies and programs, frequently setting spending ceilings for them. These authorization (sic) of appropriations provisions may be permanent, annual, or multiyear authorizations." TOLLESTRUP, THE CONGRESSIONAL APPROPRIATIONS PROCESS, *supra*, at 20.

In contrast "[a]ppropriations measures subsequently provide funding for the agencies and programs authorized." *Id.* at 1; *see also Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 190 (1978) ("We recognize that both substantive enactments and appropriations measures are 'Acts of Congress,' but the latter have the limited and specific purpose of providing funds for authorized programs.") The rules of Congress, in fact, "prohibit 'legislation' from being added to an appropriation bill." *Andrus v. Sierra Club*, 442 U.S. 347, 359–60 (1979).

With these definitions in mind, and as discussed in *Rios-Montano*, the Court finds that § 1059(a) functions as an authorization act. *Rios-Montano*, 2020 WL 601660, at *2–4. Section § 1059 states that the "Secretary of Defense may provide assistance to United States Customs and Border Protection for purposes of increasing ongoing efforts to secure the southern land border of the United States." 2016 NDAA, Pub. L. No. 114-92, § 1059(a), 129 Stat. 726, 986–87 (2015). The 2016 NDAA goes on to list the types of assistance to be provided, including the deployment of "ground-based surveillance systems" and "members and units of the regular and reserve components of the Armed Forces." *See* 2016 NDAA, Pub. L. No. 114-92, § 1059(c), 129 Stat. at 987. Conspicuously, the provision lacks any language expressly limiting its operative terms to fiscal year 2016. In addition, § 1059 self-evidently goes beyond the "specific purpose of providing funds for authorized programs." *Tennessee Valley Auth.*, 437 U.S. at 190. It provides for a new assistance program altogether, as is typical of authorization acts.

4

19-CR-4373-GPC

TOLLESTRUP, THE CONGRESSIONAL APPROPRIATIONS PROCESS, *supra*, at 10 ("Authorization acts establish, continue, or modify agencies or programs. For example, an authorization act may establish or modify programs within the Department of Defense.").

In addition, the Court's assessments of how § 1059 fits into the 2016 NDAA, and how other courts have treated NDAAs, also militate in favor of the Government's position. First, both the section's title and title of the act refer to "[a]uthorization[s]," not appropriations, *see Yates v. United States*, 135 S. Ct. 1074, 1083 (2015) (noting that headings "are not commanding" but may "supply cues" as to Congress's intention), which makes sense given the preamble's broad mandate to "*authorize* appropriations for fiscal year 2016 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, *and for other purposes*." 2016 NDAA, Pub. L. No. 114-92, 129 Stat. 726, 726 (emphasis added). Second, Congress's inclusion of termination clauses in other sections of the 2016 NDAA suggests, by comparison, that Congress did not intend for § 1059(a) to elapse with fiscal year 2016. *See e.g.*, 2016 NDAA, Pub. L. No. 114-92, § 218, 129 Stat. at 772–73 (2015) (containing an express "[t]ermination" clause). Lastly, other courts have treated recent NDAAs as capable of enacting new laws that take effect beyond the fiscal year of the respective NDAA. *See Rios-Montano*, 2020 WL 601660, at *3 (collecting cases).

Consequently, applying traditional tools of statutory interpretation, and in line with its prior ruling in *Rios-Montano*, the Court finds that the 2016 NDAA unambiguously authorized the participation of DoD personnel at issue here, namely, their observation of someone alleged to be Mr. Hernandez-Garcia through a scope, and their subsequent communication with BPA Allen-Limon as to that person's location. (ECF No. 15-1, Ex. B); *Rios-Montano*, 2020 WL 601660, at *2–4. Because the Court finds that there was no

PCA violation here, the Court does not address the other two legal issues raised by the Defendant: namely, whether the involvement of DoD personnel at the United States – Mexico border is pervasive and systemic, and whether suppression of the Government's evidence would be a proper remedy under these specific facts. *See United States v. Dreyer*, 804 F.3d 1266 (9th Cir. 2015).

### III. Conclusion

For the foregoing reasons, Defendant's motion to suppress is **DENIED** to the extent it relies on an alleged violation of the PCA. The participation of DoD personnel here through a radio transmission and scope observation is authorized by the 2016 NDAA.

**IT IS SO ORDERED.**

Dated: March 6, 2020

Hon. Gonzalo P. Curiel
United States District Judge